STATE OF NORTH CAROLINA v. WILLIAM E. TUCKER

No. 415A88

(Filed 5 September 1991)

1. **Criminal Law § 113 (NCI4th)— murder—discovery—failure to comply—sanctions refused**

   The trial court did not abuse its discretion by denying sanctions for alleged discovery violations by the State in a murder prosecution where a discovery order was entered and defendant objected at trial to the introduction of evidence that he considered to have been withheld from him in violation of the discovery order. There was no element of unfair surprise in defendant's being belatedly apprised of the serology and fingerprint test results; there was no evidence of bad faith on the part of the State in its compliance with the trial court's discovery order; and close examination of the forensic evidence belies defendant's contention that the evidence could have eroded the credibility of a State's witness and provided an inference that he, not defendant, had murdered the victim.

   **Am Jur 2d, Depositions and Discovery §§ 426, 427.**

2. **Constitutional Law § 252 (NCI4th)— murder—motion for appointment of expert—denied—no error**

   The trial court did not err in a murder prosecution by denying defendant's motion for appointment of a hair, blood,

STATE v. TUCKER

[329 N.C. 709 (1991)]

and fingerprint expert where the trial court properly concluded that the matter subject to expert testimony was not likely to be a significant factor in the defense and that defendant did not make a showing of particularized need.

**Am Jur 2d, Criminal Law § 719.**

**Right of indigent defendant in state criminal case to assistance of fingerprint expert. 72 ALR4th 874.**

**Right of indigent defendant in criminal case to aid of state by appointment of investigator or expert. 34 ALR3d 1256.**

3. **Criminal Law § 55.1 (NCI3d) — nontestimonial identification order — witness's hair — denied**

The trial court in a murder prosecution properly denied defendant's motion for a nontestimonial identification order for samples of a witness's hair. Although N.C.G.S. § 15A-281 enables a defendant to request that a nontestimonial identification order be conducted upon himself, no statute gives a defendant the right to request such an order directed against potential witnesses or any other individual.

**Am Jur 2d, Depositions and Discovery §§ 403, 447, 449.5.**

4. **Homicide § 30 (NCI3d) — first degree murder — no instruction on lesser offense — no error**

The trial court did not err in a first degree murder prosecution by failing to instruct the jury on second degree murder where there was no evidence to support a verdict of second degree murder. The evidence to which defendant points was evidence of defendant's innocence of homicide or evidence which, in light of all the evidence, tends to reinforce the proposition that the killing was premeditated and deliberated.

**Am Jur 2d, Homicide § 530.**

5. **Criminal Law § 46.1 (NCI3d) — flight — evidence sufficient — instruction properly given**

The trial court did not err in a murder prosecution by giving an instruction on flight where the jury heard evidence that defendant had shaved off a beard and mustache within two days of the murder, that police began looking for him two months later, and that he was not found until three years after the murder, in Texas. It was for the jury to decide

whether the facts supported the State's contention that defendant had fled.

**Am Jur 2d, Evidence §§ 228, 280, 281, 1128.**

6. **Criminal Law § 728 (NCI4th) — murder — instructions — balance of contentions — no error**

The trial court did not err in its instructions in a murder prosecution by not stating defendant's contentions on flight because defendant did not request such an instruction and there was no evidence offered by defendant on his absence explaining it other than as flight. If defendant wished the court to give his contention, it was his duty to say what it was and request it.

**Am Jur 2d, Evidence § 228; Trial §§ 1081, 1333-1335.**

7. **Criminal Law § 60.5 (NCI3d) — fingerprints — sufficiency of evidence to support instruction**

The trial court did not err in its instruction on fingerprints in a murder prosecution where the evidence of defendant's fingerprints was pertinent to the credibility of the witnesses who testified against him.

**Am Jur 2d, Evidence § 1144.**

8. **Criminal Law § 1215 (NCI4th) — armed robbery — mitigating factors — lack of criminal record — not found — no error**

The trial court did not err when sentencing defendant for armed robbery in a prosecution for murder and armed robbery by failing to find in mitigation that defendant had no criminal record where the State had introduced at the capital sentencing proceeding the testimony of a Connecticut police officer that defendant had been convicted in that state of two armed robberies but the court struck the testimony because the documentation was defective; no other evidence of defendant's criminal record was presented by the State or by defendant; and the jury found as a mitigating circumstance that defendant had no significant history of prior criminal conduct. A trial court imposing a sentence under the statutes governing felony sentencing is not required to find the same mitigating factors found by the jury in the capital case, and the burden of proving a mitigating factor is upon defendant alone.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 552, 554.**

**9. Criminal Law § 1135 (NCI4th) — armed robbery — aggravating factors — position of leadership — inducement of others — evidence of both sufficient**

The trial court did not err when sentencing defendant for armed robbery by finding as two separate aggravating factors that defendant occupied a position of leadership and that he induced others to commit crimes. Defendant induced criminal action by his accomplices and assumed a position of leadership at different times, and those circumstances were supported by different actions and expressions.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 552, 554.**

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from a conviction of murder in the first degree and a judgment imposing a sentence of life imprisonment entered by *Lamm, J.*, at the 16 May 1988 Criminal Session of Superior Court, CATAWBA County. Motion to bypass Court of Appeals as to defendant's armed robbery conviction and sentence allowed 19 December 1988. Heard in the Supreme Court 9 October 1989.

*Lacy H. Thornburg, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant-appellant.*

EXUM, Chief Justice.

Defendant was indicted on 6 August 1984 for the first-degree murder of Melissa Rowe and on 2 December of the following year for robbery with a dangerous weapon perpetrated at the same time as the murder. After defendant's conviction by a jury of both crimes, a capital sentencing proceeding was conducted. The jury recommended and the trial court imposed a sentence of life imprisonment in the murder case. The trial court sentenced defendant to a consecutive term of forty years' imprisonment for the armed robbery. Our review of the record of defendant's trial reveals that it was conducted without reversible error.

I.

Evidence presented by the State tended to show that the following events took place in Catawba County on Easter weekend 1984:

STATE v. TUCKER

[329 N.C. 709 (1991)]

Shortly before midnight on 21 April 1984, Catawba County Sheriff's officers found the body of Melissa Rowe in the bedroom of a mobile home. An autopsy later revealed that the victim had suffered multiple lacerations from a knife. The pathologist identified one laceration across the throat as the probable cause of her death.

On Friday evening, 20 April 1984, Randy Setzer, Barry Shuemaker, and defendant, among others, consumed cocaine throughout the night. At approximately 7:30 a.m. Saturday, Carolyn Raper drove defendant and Setzer to the trailer where the victim resided. Initially, Setzer entered alone to buy cocaine, but when the victim began having convulsions, Setzer called Raper and defendant to come in. Eventually Rowe revived sufficiently to bring a large bag of cocaine from the bedroom and to parcel out a small portion, which she gave to Setzer. Raper drove Setzer and defendant to a motel room occupied by Tony Isenhowr.*

Shuemaker introduced Isenhowr to defendant Saturday evening in the motel parking lot. The three went to Rowe's mobile home, where Isenhowr entered with defendant. Defendant bought a gram of cocaine from Rowe. The three drove to a rest area, where they injected the cocaine. Isenhowr heard defendant say that "he may have to hurt her." Isenhowr protested but was reassured by the others, and the three went back to Rowe's mobile home.

When they arrived—around 10:30 p.m.—Isenhowr again accompanied defendant into the mobile home. Shuemaker remained in the car with the engine running. Rowe came to the door and told Shuemaker to come in too, for she was on the phone. When she hung up, she invited the three to "free base" cocaine with her. Presently, after talking prices and quantities, defendant, picking up a butcher knife, followed Rowe into the bedroom. After twenty or thirty seconds a commotion broke out, and the victim hollered, "No, don't, no, don't." Shuemaker went out the front door. Isenhowr followed, but was hit at the door by a bag of cocaine thrown by defendant, who told him to take it to the car. Bending down to pick up the bag, Isenhowr saw defendant "swinging at Miss Rowe and hitting her" with a knife. She was bleeding from wounds in her face and saying "no, don't, stop it, don't do this,

---

* This name is spelled "Isenhour" in the parties' briefs and "Isenhowr" in the transcript. We adopt the transcript spelling.

just take it, they'll kill you." Isenhowr went to the car, where he and Shuemaker waited for ten or fifteen minutes. Defendant came out, holding up his bloody hands and arms. At defendant's direction, Isenhowr let defendant into the car trunk. He then drove to a mobile home belonging to Terry Barry, with whom defendant had been staying, and got a change of clothes. Remarking on the blood on defendant as he emerged from the trunk, Isenhowr asked what had happened. Defendant answered: "The bitch wouldn't shut up so I cut her fucking throat, I shut her up." Defendant washed off in a lake and changed clothes. Isenhowr, Shuemaker, Barry, and defendant drove to a pull-off, burned the bloody clothes, and then drove to Isenhowr's motel room, where they injected more cocaine and divided the cocaine they had taken from Rowe.

An SBI Special Agent removed the interior and exterior doorknobs of Rowe's mobile home and sent them to the lab for processing. He had observed what tests later proved to be a smear of the victim's blood on the knob. He chose not to lift the prints he perceived on one of the knobs in the event they had been made in blood.

Latent prints corresponding to those of defendant were found on a soda pop can and bottle found in Rowe's mobile home and on a glass from the bedroom where her body was found. Two latent prints on the interior doorknob were Isenhowr's; nothing corresponding to defendant's prints was on either the interior or exterior doorknob.

II.

[1]  Defendant first argues that the trial court erroneously denied his pretrial motion for an expert in fingerprint, hair, and blood analysis and for a nontestimonial identification order to obtain the hair of Shuemaker. This argument is closely related to defendant's contention that the trial court erred in refusing to issue sanctions against the State for discovery violations.

Within a week of the victim's death, hair samples from the crime scene and the interior and exterior doorknobs were submitted to the State Bureau of Investigation for analysis. Beyond identifying the blood on the doorknob and other stained items as being consistent with that of the victim, the report deferred further analysis, particularly of the hair samples, for a time when known samples from one or more suspects would be available. The record

does not reflect when this report was released to the office of the district attorney; but a follow-up report, dated 16 May 1988, finding no match between the crime scene hair samples and samples from Isenhowr, was not delivered to the SBI supervisor until 18 May 1988. Defendant was given both reports the same day.

Defendant had first moved on 15 October 1987 for an order allowing him to inspect the physical evidence in the State's custody and to review test analyses. The trial court deferred ruling on the motion until the State had had an opportunity to examine the file and to decide whether to permit open file discovery.

In response to a 15 February 1988 motion to dismiss alleging the State's failure to provide discovery, the State sent defendant a letter the next day granting him open file discovery.

On 23 February 1988 the trial court noted that the prior order had not compelled discovery, but had deferred ruling on the matter. The court then denied defendant's motion to dismiss, entering a full order of discovery in response to defendant's 15 October 1987 motion. The order directed the district attorney

> [to] permit the defendant through counsel to inspect and copy or photograph any relevant written or recorded statements made by the defendant or copies thereof within the possession, custody or control of the state, the existence of which is known or by the exercise of due diligence may be known to the pro[s]ecutor and . . . to divulge knowledge, [in] written or recorded form the substance of any oral statement relevant to the subject matter of the case made by the defendant regardless of to whom the statement was made within the possession, custody, control of the state the existence of which is known to the prosecutor or become[s] known to him prior to or during the course of trial . . . ; the prosecutor further and is herein ordered to permit the defendant, through his attorneys, to inspect and copy or photograph books, papers, documents, photographs, mechanical or electronic recordings, buildings and places or any other crime scene tangible objects which are within the possession, custody, or control of the state and which are material to the preparation of his defense or intended for use by the state as evidence at the trial or were obtained from or belonged to defendant.

The order required the State to allow defendant similarly to examine the evidence of physical or mental tests or experiments performed in connection with the case, and to be in compliance with its provisions within ten days. The court told defendant that he could have no more than the statute required regarding the statements of the State's witnesses—a copy when the witness testified. To the State's expression of concern that certain lab tests were not yet complete and their results might not be known within ten days, the court responded: "If you've got it, you've got . . . to give it to him." The court subsequently admonished defendant, "This is a two-way street. This doesn't require you to sit back and have him come to you. I have ordered precisely what the statute allows. Gives you an opportunity to see and copy. They're under no obligation to provide you with a thing."

Defendant next moved on 7 April 1988 for an expert to review hair, blood, and fingerprint evidence and to dismiss or continue the action. These motions and a 9 April motion for a nontestimonial identification order for Shuemaker's hair were denied 16 May 1988. The court refused to order funds for an expert, "finding that the defendant has not cited any particularized need." In addition, the court intimated that defendant, who had known about the nature of the evidence at least since December 1987, had been dilatory in not presenting the motion for an expert to the court before 7 April.

Much later in the trial, defendant again twice objected to the introduction of evidence that he considered to have been withheld from him in violation of the discovery order. His objections were overruled.

Discovery procedures are authorized by article 48, chapter 15A of the General Statutes. The purpose of these procedures is to protect the defendant from unfair surprise. *State v. Payne*, 327 N.C. 194, 202, 394 S.E.2d 158, 162 (1990), *cert. denied*, --- U.S. ---, 112 L. Ed. 2d 1062 (1991); *State v. Alston*, 307 N.C. 321, 331, 298 S.E.2d 631, 639 (1983). Whether a party has complied with discovery and what sanctions, if any, should be imposed are questions addressed to the sound discretion of the trial court. *State v. Weeks*, 322 N.C. 152, 171, 367 S.E.2d 895, 906 (1988). "[The] discretionary rulings of the trial court will not be disturbed on the issue of failure to make discovery absent a showing of bad faith by the state in its noncompliance with the discovery requirements." *State v. McClintick*, 315 N.C. 649, 662, 340 S.E.2d

41, 49 (1986). "The choice of which sanction to apply, if any, rests in the sound discretion of the trial court and is not reviewable absent a showing of an abuse of that discretion." *State v. Gladden*, 315 N.C. 398, 412, 340 S.E.2d 673, 682, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986).

The record and transcript of defendant's trial bear no indication that the trial court abused its discretion in refusing to dismiss or continue the action. First, there was no element of unfair surprise in defendant's being belatedly apprised of the serology and fingerprint test results. Defendant had been allowed funding for a private investigator to help him prepare his defense on 26 October 1987, and he had known about the general nature of the forensic evidence since December of that year. Although defendant received these test results just before the jury was to be impaneled, there was nothing unfairly surprising about their contents, for the results were not in the least inculpatory.

Second, there is no evidence of bad faith on the part of the State in its compliance with the trial court's discovery order of 23 February 1988. When the order was issued, the State explained that it did not yet have the results of laboratory tests. When the hair sample test results became available, they were delivered to defendant within two days of their release by SBI technicians. We conclude that the trial court's refusal to issue discovery sanctions was based upon a reasonable appraisal of the facts before it. We perceive no abuse of the trial court's discretion in denying sanctions for alleged discovery violations.

Third, defendant invites this Court to speculate that the blood on the doorknob was the substance into which Isenhowr's fingerprints had been impressed, evidence which suggests that Isenhowr had left the trailer after the doorknob had been smeared with the victim's blood. Defendant argues that this could have eroded Isenhowr's credibility at trial and provides an inference that it had been he, not defendant, who had murdered Rowe.

Close examination of the forensic evidence belies these contentions. The State's fingerprint expert testified that latent fingerprints left in blood are difficult to obtain with fingerprint powder, but the only difficulty she had removing Isenhowr's prints was due solely to the rounded shape of the knob. The SBI Special Agent who seized the knob testified "the blood smear was in one location, and the fingerprint and the latent impressions were in another location."

**[2]**  We hold also that the trial court did not err in denying defendant's motion for appointment of a hair, blood, and fingerprint expert. The trial court observed that, although the reports of latent fingerprint comparisons showed similarity to defendant's prints, the blood and hair reports had revealed no evidence linking defendant to the crimes charged and that it was the State's intention to introduce the testimony of witnesses who had been present during the perpetration of those offenses. The trial court concluded

> that . . . defendant . . . has made no showing of a particularized need for such assistance, that the matters subject to expert testimony are likely to be significant factors in his defense, that he will be deprived of a fair trial without such expert assistance, or that there is a reasonable likelihood that such expert assistance will materially assist him in the preparation of his defense.

These conclusions accurately articulate the requisite showing for an indigent defendant to charge the costs of expert assistance to the State. The statutory requirement that the State provide an indigent defendant with the "necessary expenses of representation," N.C.G.S. § 7A-450(b) (1989), includes the assistance of experts only upon a showing that a defendant will be deprived of a fair trial without such assistance or that there is a reasonable likelihood that it will materially assist him in the preparation of his defense. *E.g., State v. Johnson*, 317 N.C. 193, 198, 344 S.E.2d 775, 778 (1986). *See also* N.C.G.S. § 7A-454 (1989) (trial court has discretion to approve a fee for services of expert witnesses testifying for an indigent defendant).

The right to the assistance of a state-funded expert is rooted in the Fourteenth Amendment's guarantee of fundamental fairness and the principle that an indigent defendant must be given a fair opportunity to present his defense. *Ake v. Oklahoma*, 470 U.S. 68, 76, 84 L. Ed. 2d 53, 61 (1985). The Supreme Court in *Ake* held that a defendant is entitled to such assistance when he has made "a preliminary showing" that the matter calling for expert assistance "is likely to be a significant factor at trial." *Id.* at 74, 84 L. Ed. 2d at 60. Our cases interpreting *Ake* have consistently reiterated that defendant's "*ex parte* threshold showing" must reveal that the matter subject to expert testimony is "likely to be a significant factor" in the defense. *State v. Moore*, 321 N.C. at 344, 364 S.E.2d at 656-57 (quoting *Ake*, 470 U.S. at 82, 84 L. Ed. 2d

STATE v. TUCKER

[329 N.C. 709 (1991)]

at 60). "[U]nless the defendant 'makes a threshold showing of specific necessity for the assistance of the expert' requested," an expert need not be provided. *State v. Moore*, 321 N.C. 327, 335, 364 S.E.2d 648, 652 (1988) (quoting *State v. Penley*, 318 N.C. 30, 51, 347 S.E.2d 783, 795 (1986) ). Whether the showing has been made must be judged by the circumstances known to the trial court at the time defendant's request is made. *State v. Moore*, 321 N.C. at 344, 364 S.E.2d at 657.

Unlike cases in which evidence linking the defendant to the offense was entirely circumstantial and one important circumstance was inculpatory fingerprints, *e.g., State v. Bridges*, 325 N.C. 529, 385 S.E.2d 337 (1989); *State v. Moore*, 321 N.C. 327, 364 S.E.2d 648, the case against defendant here was based largely on eyewitness testimony, a fact noted in the trial court's order. Under these circumstances, the trial court properly concluded that the matter subject to expert testimony was not likely to be a "significant factor" in the defense. *State v. Moore*, 321 N.C. at 344, 364 S.E.2d at 657.

In addition, the trial court stated in its order that defendant had made no showing of a "particularized need" for the assistance of a fingerprint expert. Defendant's written motion was conclusory, stating only that the State intended to offer fingerprint and blood identification evidence and that examination by his own experts was "essential to the preparation of an adequate defense." Like "undeveloped assertions that the requested assistance would be beneficial," *State v. Hickey*, 317 N.C. 457, 469, 346 S.E.2d 646, 654 (1986) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323, n.1, 86 L. Ed. 2d 231, 236, n.1 (1985) ), undeveloped assertions that the requested assistance would be "essential" to preparing an adequate defense fall short of the required "threshold showing of specific necessity" for expert assistance.

In presenting this motion orally at the 16 May 1988 hearing, defendant added that the assistance of experts was necessary to impeach the testimony of Isenhowr and Shuemaker because "the State's version will be the testimony essentially of the two co-defendants against [defendant], the question of whether these were in fact the fingerprints of [defendant] and [Isenhowr] and their various locations, [and] the age of the fingerprints, for example, would be critical to the jury in determining who[m] to believe in this case."

We have held that "[m]ere hope or suspicion" of the availability of certain evidence that might erode the State's case or buttress

a defense will not suffice to satisfy the requirement that defendant demonstrate a threshold showing of specific necessity for expert assistance. *State v. Tatum*, 291 N.C. 73, 82, 229 S.E.2d 562, 568 (1976). Nor will a "general desire to search for possible evidence which might be of use in impeaching" a key witness for the State suffice as a "significant factor" in the defense so as to justify the appointment of an expert. *State v. Hickey*, 317 N.C. at 469, 346 S.E.2d at 654.

We hold that, under this Court's interpretation of the rights of an indigent defendant under the federal and North Carolina Constitutions and under the laws of this State, the trial court correctly concluded that defendant had failed to make the requisite showing of need for a hair, blood, and fingerprint expert.

[3] Defendant's assignments of error concerning the trial court's refusal to issue a nontestimonial identification order for samples of Shuemaker's hair are likewise without merit. In support of this motion defendant had stated that "[a] positive comparison [of the hair at the crime scene] with Isenhowr['s] or Shuemaker's hair would show they are not telling the truth" and that such a comparison would show that one of them had killed the victim and that defendant was innocent. Among its stated reasons for denying defendant's motion for this nontestimonial order, the trial court concluded not only that defendant's logic was "faulty" in this reasoning, but also that defendant had made "no further showing of any particularized need for the nontestimonial identification procedures."

A judge may issue a nontestimonial identification order upon the request of a prosecutor. N.C.G.S. § 15A-271 (1988). The order is a creature of, and its issuance strictly regulated by, statute. This statute is among those codified in article 14 of chapter 15A, which this Court has noted "applies only to suspects and accused persons before arrest, and persons formally charged and arrested, who have been released from custody pending trial." *State v. Welch*, 316 N.C. 578, 585, 342 S.E.2d 789, 793 (1986) (quoting *State v. Irick*, 291 N.C. 480, 490, 231 S.E.2d 833, 840 (1977)). A prosecutor requesting such an order must present an affidavit showing probable cause to believe an offense punishable for more than one year has been committed, reasonable grounds to suspect that the person named or described in the affidavit committed the offense, and that the results of specific procedures will be of material aid

in determining whether the person named in the affidavit committed the offense. N.C.G.S. § 15A-273 (1988).

Although the applicable statute enables a defendant to request that a nontestimonial identification order be conducted upon himself if this will aid materially in determining whether he committed the offense, N.C.G.S. § 15A-281 (1988), no statute gives a defendant the right to request such an order directed against potential witnesses against him or against any other individual. One good reason for the absence of such a provision is its potential for such abuse as intimidating witnesses. *See, e.g., State v. Clontz*, 305 N.C. 116, 119-20, 286 S.E.2d 793, 795 (1982); *State v. Looney*, 294 N.C. 1, 28, 240 S.E.2d 612, 627 (1978).

We hold the trial court properly denied defendant's motion for a nontestimonial identification order directed against the witness Shuemaker, not for the reasons it stated, but because there is no statute or other authorization for such an order.

III.

Defendant raises three issues regarding the trial court's instructions to the jury.

[4] First, defendant contends the trial court erred in failing to instruct the jury on second-degree murder. The State prosecuted defendant on theories of premeditated and deliberated murder and felony murder, and he was convicted of first degree murder on both theories.

The trial court is required to instruct on a lesser included offense only when there is *evidence* to support a verdict finding the defendant guilty of such lesser offense. When no evidence supports a lesser included offense, the trial court has no duty to instruct the jury on such offenses. *E.g., State v. Hickey*, 317 N.C. at 470, 346 S.E.2d at 655.

We find no evidence in the record to support a verdict of second-degree murder. The fingerprint and blood smear on the doorknob did not provide such evidence, even though defendant continues to speculate here, as he argued to the jury, that they *might* have demonstrated that Isenhowr, not defendant, actually killed Rowe. Even if such evidence tends, as defendant argues, to exculpate him, this is evidence not of second-degree murder

but of defendant's innocence of homicide other than on a felony murder theory.

Defendant next suggests that his statement, "The bitch wouldn't shut up so I cut her fucking throat," is evidence the killing was not premeditated or deliberated and his intent to kill was formed in the heat of his struggle with the victim. *See, e.g., State v. Misenheimer*, 304 N.C. 108, 113-14, 282 S.E.2d 791, 795-96 (1981).

In light of all the evidence presented, we conclude this statement by defendant is insufficient to support a verdict of second-degree murder. Shuemaker testified that defendant picked up a butcher knife from the counter as he followed the victim into her bedroom. Isenhowr testified that he saw defendant "strike" the victim once in the head. Defendant's exclamation when considered with this evidence tends to reinforce the proposition that the killing was cold and calculated, premeditated and deliberated, and done with the required specific intent to kill.

[5] The second jury instruction with which defendant takes issue was the trial court's charge that "evidence of flight, considered with other facts and circumstances, may be considered . . . in determining whether [these] amount to admission or show a consciousness of guilt." Defendant contends there was no direct evidence that he "fled" to Texas, where he was apprehended more than three years after the stabbing. He adds that the trial court failed to balance the State's contentions on flight with defendant's contentions and the instruction amounted to an expression of opinion by the trial court about the case.

Defendant's argument regarding the trial court's instruction on flight is meritless. The jury heard evidence that defendant had shaved off a beard and mustache within two days of the murder, that police began looking for him two months later, and that he was not found until three years after the murder—in Texas. "[F]light from a crime shortly after its commission is admissible as evidence· of guilt," *State v. Self*, 280 N.C. 665, 672, 187 S.E.2d 93, 97 (1972), and a trial court may properly instruct on flight "[s]o long as there is some evidence in the record reasonably supporting the theory that defendant fled after the commission of the crime charged," *State v. Greene*, 321 N.C. 594, 607, 365 S.E.2d 587, 595 (quoting *State v. Irick*, 291 N.C. at 494, 231 S.E.2d at 842), *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). We hold the record in this case includes such evidence.

Moreover, it was for the jury to decide whether these facts, taken together with other facts and circumstances, supported the State's contention that defendant had fled. The trial court appropriately told the jury it could consider evidence of flight. The court accurately identified the contention that defendant had fled as that of the State.

[6] Nor is the statement of a valid contention based on competent evidence an expression of judicial opinion. *State v. Virgil*, 276 N.C. 217, 230, 172 S.E.2d 28, 36 (1970). The trial court is not required by N.C.G.S. § 15A-1232 nor was it required by the predecessor statute, N.C.G.S. § 1-180, to state the contentions of the litigants. *State v. Dietz*, 289 N.C. 488, 499, 223 S.E.2d 357, 364 (1976). The trial court bears an implicit duty only "to give equal stress to the State and defendant in a criminal action," a requisite repealed by 1977 N.C. Sess. Laws ch. 711, § 1, but nonetheless still "imposed on the judge by general requirements of fairness to the parties." N.C.G.S. § 15A-1232 official commentary (1988). *See State v. Hewett*, 295 N.C. 640, 643-44, 247 S.E.2d 886, 888 (1978).

In this case the trial court did not state defendant's contentions regarding his absence because there was no evidence offered by defendant explaining it as other than flight, and defendant did not request such an instruction. In a bench conference regarding the court's intended instructions, defendant merely objected to the State's interpretation of his absence from this jurisdiction as flight; he offered no alternative explanation for that absence and did not request that the jury be instructed regarding such an explanation. If defendant wished the court to give his contention under those circumstances, it was his duty to say what it was and request it. *State v. Self*, 280 N.C. at 672, 187 S.E.2d at 97.

The instructions on flight were proper and revealed neither trial court bias nor opinion about the case. *Id.* at 673, 187 S.E.2d at 98.

[7] Third, defendant assigns error to this portion of the trial court's instruction regarding his fingerprints:

> [I]f you find beyond a reasonable doubt that fingerprints corresponding to those of the defendant were lifted from the scene of the alleged crime, whether or not you find that they were impressed at the time the crimes were committed you may, nevertheless, consider this evidence as it may bear on the truthfulness of a witness together with all other facts

and circumstances bearing upon that witness' truthfulness in deciding whether you will believe or disbelieve that witness' testimony at this trial.

Defendant avers that if the jury believed his fingerprints were left on the first of the three occasions he visited the victim's trailer, then the evidence would have been irrelevant and an instruction thereon improper.

On the contrary, if the jury believed that defendant's fingerprints were left from his first visit, this would have reflected on the credibility of Raper's testimony. If it believed they were left from defendant's second visit, this would have reflected upon the credibility of the testimony of Isenhowr. If the jury believed the fingerprints were left from defendant's last visit, they bore upon the credibility of both accomplices. Evidence of defendant's fingerprints — whether they were left at any of these three visits to the trailer in which the victim lived — was pertinent regarding the credibility of any of the witnesses who testified against him.

Defendant's arguments on appeal regarding the trial court's instructions on fingerprints appear to be grounded in cases in which circumstantial evidence linking a fingerprint to the corpus delicti was held to be insufficient to withstand a motion for nonsuit. *See, e.g., State v. Palmer*, 230 N.C. 205, 52 S.E.2d 908 (1949). The question before us is the admissibility of fingerprint evidence for corroboration purposes.

It is well established that evidence of the correspondence of fingerprints given by an expert is admissible on the question of identity. The admissibility of such evidence is consistent with the rule of relevance which permits the introduction of any evidence which "has any logical tendency, however slight, to prove a fact at issue in the case."

*State v. Banks*, 295 N.C. 399, 411-12, 245 S.E.2d 743, 751-52 (1978). Because fingerprint evidence is relevant and thus admissible to corroborate the testimony of a prosecuting witness, we hold that this instruction, like that on flight, was a correct statement of the law and was supported by evidence before the jury.

IV.

[8] With regard to his sentence for robbery with a dangerous weapon, defendant first contends that the trial court erred in failing

to find as a mitigating factor that defendant had no criminal record, N.C.G.S. § 15A-1340.4(a)(2)a (1988).

Under the provisions governing felony sentencing applicable to the circumstances of this case, the sentencing court may consider any aggravating or mitigating factors found to be "proved by the preponderance of the evidence, and . . . reasonably related to the purposes of sentencing." N.C.G.S. § 15A-1340.4(a) (1989). It is error for the trial court not to find a particular mitigating factor when evidence supporting it is "uncontradicted, substantial, and there is no reason to doubt its credibility." *State v. Daniel*, 319 N.C. 308, 312, 354 S.E.2d 216, 218 (1987) (quoting *State v. Jones*, 309 N.C. 214, 218-19, 306 S.E.2d 451, 454 (1983)). The burden is on defendant to prove the existence of a mitigating factor by a preponderance of the evidence. *E.g.*, *State v. Canty*, 321 N.C. 520, 523, 364 S.E.2d 410, 413 (1988).

In the capital sentencing proceeding, the State introduced the testimony of a Connecticut police officer that defendant had been convicted in that state of two armed robberies as proof of the aggravating circumstance that defendant had prior convictions for felonies involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3) (1988). Because documentation of this criminal history was defective, the trial court struck the officer's testimony and instructed the jury to disregard it. No other evidence of defendant's criminal record was presented, either by the State or by defendant himself. The jury's recommendation as to punishment in the capital phase of defendant's trial included finding as a mitigating circumstance that defendant had no significant history of prior criminal activity.

Imposing a sentence for armed robbery exceeding the statutory presumptive term, the trial court did not find the analogous mitigating factor under the felony sentencing statutes, N.C.G.S. § 15A-1340.4(a)(1)o (1988).

The trial court did not err. A trial court imposing a sentence under the statutes governing felony sentencing is not required to find the same mitigating factors found by the jury in the sentencing phase of the capital case. *State v. Avery*, 315 N.C. 1, 36-37, 337 S.E.2d 786, 806 (1985). The sentencing court must find a mitigating factor when the evidence is uncontradicted, substantial, and manifestly credible. *State v. Holden*, 321 N.C. 689, 695, 365 S.E.2d 626, 629 (1988). The burden of proving a mitigating factor is upon defend-

ant alone, however, and this he must do by a preponderance of the evidence. *E.g., State v. Parker*, 315 N.C. 249, 255, 337 S.E.2d 497, 500 (1985). Given defendant's failure to carry his burden of persuasion, we hold that the decision of the trial court not to consider defendant's criminal record as a factor in mitigation of his sentence was proper.

[9] Second, defendant contends that the trial court erred in finding as two separate aggravating factors that defendant occupied a position of leadership and that he induced others to commit crimes. *See* N.C.G.S. § 15A-1340.4(a)(1)a (1988). This Court has held that both the fact that a defendant induced others to commit a crime *and* his position of leadership may be found as separate, independent factors in aggravation of his sentence "so long as there is separate evidence to support each." *State v. Erlewine*, 328 N.C. 626, 638, 403 S.E.2d 280, 287 (1991). Both Isenhowr and Shuemaker testified that it was defendant who proposed that the three go to the victim's trailer in order to steal her cocaine, evidence that supports the trial court's finding that defendant induced others to participate in that offense. Both Shuemaker and Isenhowr testified in addition that defendant entered with Isenhowr, leaving Shuemaker in the car until the victim invited him in, then initiated and completed the actual theft and murder, supported in only minor ways by his accomplices, whose actions he directed throughout the crime and its aftermath. Defendant induced criminal action by his accomplices and assumed a position of leadership in the enterprise at separate times, and these circumstances were each supported by different actions and expressions preserved in the record. The trial court therefore properly considered and found both prongs of this statutory aggravating factor.

For the foregoing reasons we hold that both the guilt and noncapital sentencing phases of defendant's trial were conducted without error.

No error.