STATE OF NORTH CAROLINA v. MICKEY ALTON PHIPPS

No. 565A90

(Filed 25 June 1992)

1. **Constitutional Law § 266 (NCI4th)— robbery and murder— questioning—Sixth Amendment right to counsel—no custodial interrogation**

 A defendant in a robbery and murder prosecution was not deprived of his Sixth Amendment right to counsel where he contended that law enforcement officers postponed arresting him so that they could interrogate him repeatedly without affording him constitutional protections. The Sixth Amendment right to counsel does not attach at the time of interrogation or arrest, but at the first appearance before a judge of the district court. Defendant here had not been arrested at the time he gave his confession and it could not be concluded that there was a violation of his Sixth Amendment right to counsel.

**STATE v. PHIPPS**

[331 N.C. 427 (1992)]

**Am Jur 2d, Criminal Law §§ 732, 734, 735.**

**Denial of, or interference with, accused's right to have
attorney initially contact accused. 18 ALR4th 669.**

2. **Evidence and Witnesses § 1235 (NCI4th)— robbery and
murder—interrogation—Miranda warnings—no custodial
interrogation**

The trial judge correctly concluded that a defendant in
a murder and robbery prosecution was not in custody and
was not entitled to *Miranda* warnings prior to his confession
where defendant cooperated with the investigation from the
outset and several times went to the police station on his
own; he answered questions on those occasions and was finger-
printed; defendant was not arrested and was permitted to
return home each time; defendant returned investigators' phone
calls, agreed to meet with them to discuss his alibi, agreed
to a polygraph test, and accompanied law enforcement officers
to Hickory for that purpose; defendant declined to take the
test after being informed that he did not have to take the
test, that he could remain silent, and that anything he said
could be used against him; the officers drove him back to
North Wilkesboro; defendant later spoke in casual circumstances
with a local attorney who advised defendant that he did not
have to take the polygraph test; defendant later agreed to
go with the officers to the police station to clear up some
matters; after about an hour at the station, defendant agreed
to go with officers to Hickory to take the polygraph test;
officers complied with defendant's request to take him by his
house and offered to make sure he got something to eat; de-
fendant was advised by his wife to call an attorney and not
take the test; defendant waited at the SBI office in Hickory
by himself in a lobby with unlocked doors for over thirty
minutes; he was allowed to use the restroom unaccompanied
several times; he was again informed of his rights prior to
taking the test and signed a waiver; he waited alone while
the results were compiled; he was again informed that he
was not under arrest and was free to leave; an agent then
confronted defendant with negative test results and asked for
the truth; defendant asked for and received permission to call
his mother; and defendant made and then repeated his
confession.

STATE v. PHIPPS

[331 N.C. 427 (1992)]

Am Jur 2d, Criminal Law §§ 791-797.

What constitutes "custodial interrogation" within the rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565, Sec. 1.

3. Evidence and Witnesses § 1221 (NCI4th) — murder and robbery — interrogation — waiver of rights — knowing, intelligent and voluntary

The confession of a robbery and murder defendant was voluntarily made although defendant contended that multiple interrogations including law enforcement visits to his home, the long duration of one session including lack of sleep and food, and the confrontation with his earlier inconsistent and untruthful statements caused both his confession and the waiver of his constitutional rights to be involuntary.

Am Jur 2d, Evidence §§ 529, 543-545, 549-552.

Suppression before indictment or trial of confession unlawfully obtained. 1 ALR2d 1012.

Admissibility of pretrial confession in criminal case — Supreme Court cases. 4 L. Ed. 2d 183.

4. Constitutional Law § 252 (NCI4th) — appointment of investigator denied — no error

The trial court did not err by denying a murder and robbery defendant's motion for the appointment of an investigator where defendant's motion referred to no particular evidence or issue that would be significant to the case and was an insufficient showing of particularized need for expert assistance.

Am Jur 2d, Criminal Law § 719.

Right of indigent defendant in state criminal case to assistance of investigators. 81 ALR4th 259.

5. Constitutional Law § 244 (NCI4th) — motion for additional expert assistance — ex parte hearing denied — no error

The trial court did not abuse its discretion in a prosecution for murder and robbery by denying defendant an *ex parte*

hearing at which to apply for funds to employ expert assistance. The decision to grant an *ex parte* hearing is within the trial court's discretion; although such a hearing may be the better practice, it is not always constitutionally required under *Ake v. Oklahoma*, 470 U.S. 68.

**Am Jur 2d, Criminal Law § 719.**

6. **Evidence and Witnesses § 1686 (NCI4th) — murder — photographs of crime scene and victim's body — no abuse of discretion**

The trial court did not abuse its discretion in a prosecution for robbery and murder by allowing the State to introduce fifty-two color photographs of the crime scene and the victim's body where the circumstances surrounding the presentation of the photographs, and the photographs themselves, were not such that it could be said that their admission for illustrative purposes was not the result of a reasoned decision.

**Am Jur 2d, Homicide §§ 416-419.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

7. **Criminal Law § 410 (NCI4th) — murder and robbery — volume of physical evidence — cumulative effect — no error**

There was no error in a prosecution for robbery and murder in the manner in which the prosecutor sought to fulfill his duty through the presentation of evidence where defendant contended that the cumulative effect of the prodigious volume of physical evidence and expert or investigative testimony was confusion and undue prejudice.

**Am Jur 2d, Trial §§ 497, 502.**

8. **Homicide § 113 (NCI4th) — first degree murder — intoxication as defense — instruction refused — degree of intoxication**

The trial court did not err in a first degree murder prosecution by refusing defendant's request for a jury instruction on voluntary intoxication where defendant presented no evidence relating to his degree of intoxication.

**Am Jur 2d, Homicide § 458.**

STATE v. PHIPPS

[331 N.C. 427 (1992)]

9. **Criminal Law § 25 (NCI4th) — voluntary intoxication — standard of proof — defendant not unconstitutionally prevented from presenting evidence**

The high evidentiary standard of proof required as a prerequisite to a voluntary intoxication instruction does not unconstitutionally prevent a defendant from presenting evidence in his defense; the presence of a burden of production cannot reasonably be said to preclude introduction of evidence.

**Am Jur 2d, Homicide § 458.**

10. **Homicide § 514 (NCI4th) — second degree murder — not submitted — no prejudicial error**

There was no prejudicial error in a prosecution for murder and robbery where the court denied defendant's request to submit the possible verdict of second degree murder. Although second degree murder should have been submitted because the jury could have concluded on the evidence that defendant killed the victim with malice but without premeditation and deliberation, the jury based its verdict on both premeditation and deliberation and the felony murder rule.

**Am Jur 2d, Homicide §§ 486, 496.**

**Modern status of law regarding cure of error, in instruction as to one offense, by conviction of a higher or lesser offense. 15 ALR4th 118.**

Justice MEYER dissenting.

Justices MITCHELL and LAKE join in this dissenting opinion.

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Ross, J.,* at the 7 May 1990 Criminal Session of Superior Court, WILKES County, upon a jury verdict finding defendant guilty of one count of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his conviction for robbery with a dangerous weapon was allowed by this Court on 25 February 1992. Heard in the Supreme Court 11 May 1992.

*Lacy H. Thornburg, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*D. Thomas Lambeth, Jr., June K. Allison, and Julie A. Risher for defendant appellant.*

WHICHARD, Justice.

Defendant appeals his convictions for first-degree murder and robbery with a dangerous weapon. In a capital trial, the jury found defendant guilty of first-degree murder on the basis of both premeditation and deliberation and the felony murder rule. The jury recommended a sentence of life imprisonment for the murder. The trial court imposed that sentence in addition to a forty-year sentence for the robbery conviction. We conclude that the trial court erred in failing to submit the charge of second-degree murder, but we hold the error to be nonprejudicial in light of the felony murder verdict. Because the first-degree murder conviction may be upheld only by virtue of the felony murder rule, however, we arrest judgment on the underlying felony, robbery with a dangerous weapon.

The State presented evidence tending to prove the following facts and circumstances: On 7 May 1989, Janice Sheets was working as the manager of the Adams Seafood restaurant in North Wilkesboro. As manager, one of her duties was to make the night deposit at First Union Bank. Sheets left the restaurant at about 11:00 p.m. and drove her car to make the deposit. A night watchman in the vicinity of the bank saw Sheets' car in the parking lot at 11:40 p.m. and again at 12:40 a.m. A depositor discovered Sheets' car in the bank parking lot at approximately 1:20 a.m. and reported it to the authorities. Officers Burns and Bailey of the North Wilkesboro Police Department investigated the report and found the dead body of Janice Sheets.

The autopsy revealed both blunt and sharp force injuries to the victim's head and a defensive injury to one finger on the victim's right hand. The victim received as many as eighteen blows to the head, but the cause of death was an incised wound or a sharp force wound to the neck. This wound was approximately four inches long, one and one-half inches wide, and it involved a complete transection, or cutting, of the right jugular vein.

The murder investigation revealed that two bank deposit bags containing cash, checks, and credit card receipts totalling $9,556.65

were taken from Janice Sheets. Nineteen identifiable fingerprints were found in the victim's car, fifteen of which matched the victim's. The four remaining identifiable fingerprints did not match the victim's or defendant's, but were otherwise unidentified. Investigators found several other latent prints with insufficient ridge detail for proper identification. Forensic tests of blood and hair samples failed to identify a suspect.

Two witnesses testified that they saw an individual matching defendant's general description in the vicinity of the murder scene near the time of the crime. One identified defendant as the individual she saw that night.

As part of the murder investigation, SBI Special Agent Steve Cabe spoke with employees of the restaurant, including defendant, who worked as a cook and busboy. Agent Cabe first spoke with defendant on 8 May 1989. Defendant told Cabe he had left the restaurant at about 10:00 p.m. and gone to the Run-In, a nearby convenience store, and talked with Mark McNeill. In a second conversation with Agent Cabe, on 10 May 1989, defendant said he had bought a six-pack of beer and some gasoline at the Run-In. Defendant said he spoke with McNeill and then went straight home. After learning that investigators had interviewed his wife, defendant admitted that he had not gone straight home but instead had been with his cousin, Lois Bailey, until midnight. Defendant told Cabe that he had been seeing Lois for approximately four years, and that they parked his car in an alley that evening.

Lola Simpson, whose maiden name was Bailey,[1] testified that she had known defendant for about seven years and that they had had an affair for about four years. Simpson testified that defendant called her on 12 May 1989 and told her he had given the police her name and that he needed an alibi for the time of Janice Sheets' murder. Defendant responded negatively when Simpson asked him if he had killed Sheets. He said that he needed the alibi because he had been out drinking with Tracy Dowell, who was underaged, and did not want to get Tracy in trouble. Simpson indicated to defendant that she needed to think about whether to provide him with an alibi. Tracy Dowell testified at trial that he was not with defendant on the evening of the murder.

---

1. It appears from the transcript, though with less than complete clarity, that Lois Bailey and Lola Simpson are one and the same.

Defendant called Simpson again on 18 May 1989 to ask whether the police had spoken with her. He again said he wanted her to tell the police that he was with her between 10:30 and 11:00 p.m. on the evening of the murder. Police officers spoke with Simpson the next day, and she told them she had been at her mother's house on the evening of 7 May and defendant had not been with her.

Defendant spoke with SBI Special Agent William Foster at the police department on 19 May 1989. According to Foster, defendant said he had "told some fabrications" because he did not have an alibi for the night of Janice Sheets' murder. In this interview, defendant told Foster that Sheets had asked him to put a cardboard box in her car just before he left work. Defendant complied with that request and then told Sheets he was leaving. Defendant went to the Run-In and then waited in the alley for Lola Simpson. Defendant drank a couple of beers, drove around for a while, and then went home.

Less than a month later, defendant admitted his responsibility for the death of Janice Sheets. SBI Special Agent Jonathan Jones testified that defendant made the following inculpatory statement to him on 8-9 June 1989:

> I got of [sic] work at Adams Seafood and Steakhouse around 10:30 p.m. Sunday night. I called my mother from the pay phone at Adams Seafood and Steakhouse. Jan asked me to put a box in the car. I used Jan's keys to unlock her car and put the box on the front seat. I think the box contained papers. I locked Jan's car and gave Jan her keys back. I got in my car and smoked pot and drank beer and rode around. At approximately 10:45 p.m., I went back to Adams and sat in my car and drank beer. Jan came out and asked me to ride with her to make the deposit. I got in Jan's gray Buick and ask [sic] Jan how much money did they take in. Jan said thirty-some hundred. I asked Jan — excuse me — I asked could I have the money and Jan said, "No." We drove to the bank and I said, "Janice, I really need this money because I am about to lose my house." She said, "Hell, no!" Jan started out of the car and I grabbed her by the hair and pulled her into the car. She smacked me in the face. I hit her around the head with my hand. Jan had a ratchet that was silver chrome. She tried to hit me with it. I blocked it. It fell to the floor. I picked it up and hit Jan in the head with the

STATE v. PHIPPS

[331 N.C. 427 (1992)]

ratchet several times. It stung her, but didn't knock her out. Jan came up with a knife and Jan tried to cut me. We wrestled and I got the knife and stabbed Jan in or around the neck. She was bleeding a lot. I picked up everything I had my hands on and the money bag and the ratchet or bar and her keys and ran, ran towards my car at Adams.

The State also presented evidence that defendant was in dire financial straits. Shortly before the murder, defendant unsuccessfully sought loans of more than one thousand dollars from two financial institutions, and he faced foreclosure on his residence. Yet, within a week after the murder and robbery, defendant made up two delinquent house payments with $2,137.75 in cash. He also made up delinquencies on two other loan accounts and a Duke Power Company account. Further, he made retribution in cash of almost $100 worth of bad checks he had written.

Defendant presented no evidence at the guilt stage of the trial. The jury returned a verdict of guilty of first-degree murder, based on both the felony murder rule and a finding of premeditation and deliberation, and robbery with a dangerous weapon. The jury recommended that defendant receive a sentence of life imprisonment for the murder. The trial court sentenced defendant to life imprisonment for the murder conviction and to a consecutive forty-year term for the robbery conviction.

In his first assignment of error, defendant contends that the trial court erred in denying his motion to suppress certain inculpatory statements. During the investigation, law enforcement officials questioned defendant at least ten times. The questioning culminated in the 8-9 June confession described above. Defendant argues that his motion to suppress the inculpatory statements should have been granted because the statements were obtained prior to his having been advised of his constitutional rights and under such circumstances that the statements were made unknowingly, unintelligently, and involuntarily. We disagree.

Judge Rousseau denied defendant's motion to suppress on the grounds that

all statements given by the Defendant to the officers or to Officer Cabe on May the 8th, and 10th, to Chief Miller on May the 10th, to Detective Jarvis on May the 10th, May the 19th, June the 2nd, June the 5th, and June the 8th, were

freely and voluntarily given; that at no time was the Defendant arrested or in custody, and that he was not entitled at that time to any Miranda warnings . . . .

The Court further concludes that no reasonable person would have believed that he was in custody prior to 2:00 a.m. on June 9, 1989, and therefore, the defendant was not entitled to any *Miranda* warnings prior to that time.

The Court further concludes that the Defendant freely and voluntarily went to the SBI office in Hickory with North Wilkesboro police officers and that at that time, he was advised of his Miranda rights as well, as well as his right to take the polygraph, and that the Defendant freely, voluntarily and of his own free will agreed to take the polygraph after being advised of the rights to take the polygraph and after being advised of his Miranda rights; [and] that the Defendant freely and voluntarily agreed to talk without a lawyer knowing that his statement could be used against him . . . .

These legal conclusions were based on the following extensive findings of fact:

That on May the 7th, 1989 sometime prior to midnight, that a body was found in the Town of North Wilkesboro; that that person had been an employee of Adams Seafood . . . that the North Wilkesboro Police Department began an immediate investigation of the killing; that on May the 8th, the police department, along with the SBI, and other law enforcement officers began interviewing each of the employees at Adams Seafood, one of them being the defendant; that at 8:35 p.m. in response to a request, the Defendant went to the North Wilkesboro Police Department at which time he was interviewed by . . . SBI Agent Cabe. At that time, the Defendant was not under arrest and left [at] approximately 9:00 p.m. . . .

That some eight or ten other employees were also requested by the officers to come to the police department at which time they were all interviewed; each of these persons being interviewed individually, and on this occasion, the Defendant was not advised of any rights, nor was he under arrest.

That on May 10th, the Defendant was again asked to come to the police station; that the Defendant and other employees were being reinterviewed that day; that the Defend-

ant was not under arrest, nor were any threats or promises made to him on this occasion or the previous day; that he appeared at the police department about 5:45 p.m. and left about 8:00 p.m.; that prior to leaving he was asked who he thought killed the deceased.

Again, on May the 10th, Detective Jarvis . . . was investigating this crime as well as some other crime, and that he asked the Defendant to submit to fingerprinting to be used in another case as well as the incident [sic] case in order to possibly eliminate any person whose prints were found at the scene; that the police department took prints of four or five other employees, some EMS employees as well as the North Wilkesboro police that might have been found at the scene; that on this occasion, the Defendant voluntarily submitted to fingerprinting; that at this time, he was not under arrest, nor was he in custody.

That again, on May the 18th, the Defendant was asked to take the polygraph test and he was taken to Hickory at about 4:00 p.m. by the North Wilkesboro police officers; that prior to going, the Defendant stated that he would take the polygraph; that he did not have an attorney, but at that time, was not under arrest and voluntarily went with the officers to the SBI office in Hickory; that upon arriving at the office, SBI Agent Jones advised him of his rights to remain silent, anything he said could be used against him, and that he did not have to take the polygraph examination; that at that time, the Defendant refused to take the polygraph; that sometime after that date, the Defendant, while at the supermarket . . . met John Hall, an attorney in Wilkesboro; that Mr. Hall advised him that he did not have to take a polygraph . . . .

That on May the 19th, Detective Jarvis again talked to the Defendant by telephone; that the officer had previously left word for the Defendant to call him at the police station and the Defendant did return the call to Detective Jarvis . . .; that at that time, Detective Jarvis made some notes of the conversation; at that time, the Defendant was not advised of his rights, nor was he under arrest and was not in custody; that later that day, the Defendant did come to the police department as a result of Officer Jarvis' request; that the Defendant came by himself at about 5:45 p.m. and remained

until about 7:00 p.m. at which time the Defendant left; that on June the 2nd, Officer Jarvis again asked the Defendant to come to the police department, at which time, he was there about thirty minutes, during which time, Officer Jarvis talked to the Defendant about another case as well as the incident [sic] case; that at no time was the Defendant placed under arrest, nor advised of any rights; that Officer Jarvis again, on June the 5th, went to the Defendant's residence and talked to the Defendant outside the Defendant's house for several minutes; that he was not arrested at that time, nor in custody.

On June the 8th, Officer Jarvis again went to the Defendant's residence at about 7:45 p.m. and told the Defendant that he needed to talk to him and that he needed to go with him to the police station; that the Defendant left with Officer Jarvis and went to the police department; at that time, the Defendant was not under arrest and voluntarily went with the police officer; that upon arriving at the police station, Chief Miller, Lieutenant Brown and SBI Agent Foster talked with the Defendant; at that time, he was not under arrest, and was not in custody; that the Chief advised the Defendant he needed to talk with him in order to clear up certain things; that the Chief asked the Defendant to take a polygraph and the Defendant stated that he would; that he would do it tomorrow or Monday; the Chief then told him that it needed to be done tonight; that the Defendant advised the Chief that he had not eaten and the Chief said they would eat on the way to Hickory; that the Chief further advised him that the Defendant had put his friends in the middle of a murder situation, and that it needed to be cleared up; that the Defendant then said he would take the polygraph, but he wanted to go by his residence first; that the Defendant, the Chief and the other two officers then went to the Defendant's residence, at which time the Defendant asked the Chief to go inside the house with him . . . which the Chief did; that upon being inside the house . . . the Defendant's wife was present; that she advised the Defendant to get a lawyer, call John Hall; that the Defendant said, "No, I'm not going to. I'm going to clear it up tonight and take the test." That the Defendant and his wife walked down the hall away from the Chief for some several minutes; that the Defendant then returned and said he needed some money for cigarettes, and after getting the money, he

and the chief went to the car and they started to Hickory; that on the way to Hickory the Chief suggested that they stop and eat, but the Defendant said, "No, let's get it over with. We can eat later"; that the Defendant and the officers arrived at the SBI office in Hickory at around ten o'clock, at which time the Defendant was left in the lobby of the SBI office for some thirty minutes or more while the Chief, SBI Agent Foster and Lieutenant Brown went into an inner office; that at about 10:33, SBI Agent Jones came into the lobby, introduced himself to the Defendant and asked the Defendant if he wanted to take the polygraph; that the Defendant replied that he wanted to take the polygraph, but asked where the rest room was; that the officer showed the Defendant where the rest room was and the Defendant left his presence; that while sitting in the lobby of the SBI office, the outer door to the office was unlocked at all times while the Defendant was in the lobby; that when the Defendant returned from the rest room, Agent Jones took the Defendant to an examination room at which time he advised him of certain rights; that the Defendant signed a waiver stating that he was . . . twenty-six years of age, and that he voluntarily, without threats, duress, coercion, force, promise of immunity or reward, and understandingly agreed to take the polygraph examination; that Officer Jones then advised him that he was not required to take the examination; that he had a right to consult with an attorney, or anyone he wished to before signing this form or taking the examination; Officer Jones advised him that he had a right to remain silent the entire time that he was there, that anything he said could be used against him, that he had a right to talk to an attorney before answering any questions, and to have the attorney present during the questioning, that if he could not afford an attorney, and desired one, an attorney would be appointed before any questions if he wished; that if he desired to make any statements that he had a right to stop at any time, and that he had a right to stop and not answer any questions until he talked to an attorney; that the defendant stated that he understood those rights and signed a written waiver whereupon . . . Officer Jones proceeded to prepare for the examination and did examine the Defendant, and having completed the examination at 12:12 a.m. on June 9th; that Officer Jones then went to another room to analyze the results of the test and when

he returned, he, again, told the Defendant that he was free to leave, that he was not under arrest; that the Defendant stated he wanted to stay and knew that he could leave at any time he wanted to whereupon the agent told the Defendant that he was lying and that he wanted him to tell him the truth about the murder, this being approximately 2:00 a.m.; that at that time the Defendant requested to make a telephone call to his mother and the officer stated that he asked him if he would tell the truth if he made the phone call; that the Defendant stated that he would; that the Defendant then made a phone call to supposedly his mother; that the Defendant then made a statement beginning about 2:00 a.m. and ending at . . . 2:30 a.m.; during this period of time, the Defendant did not appear sleepy; that he was not confused; that his answers were responsive; that he didn't complain of anything, though he did use the restroom on one or more occasions; that he did not request an attorney; that he made no complaints of anything; that no promises were made to him and no threats.

Agent Jones then requested of the Defendant as to whether he could call in SBI Agent Foster and have the Defendant repeat his statement to Officer Foster; that Officer Foster was brought into the interview room, at which time the Defendant made a statement to Officer Foster; that after Officer Foster obtained a statement, he then had the Defendant . . . sign another form or waiver stating that he reaffirmed the above agreement and that he knowingly and intelligently continued to waive all rights, and that during the period of time he had been in the SBI office, that he'd been well treated; that he submitted freely to the examination knowing he could stop any time; that he remained on his own free will and stated that he could have left the room at any time he so desired; Defendant further stated by the statement that no threats or promises or harm was done to him during the entire period.

Our review of the record reveals that these findings of facts are supported by plenary competent evidence. They thus are binding on this Court on appeal. *State v. Jenkins*, 292 N.C. 179, 184, 232 S.E.2d 648, 652 (1977).

[1] Defendant argues first that Judge Rousseau erred in concluding that he was not entitled to *Miranda* warnings until 2:00 a.m. on

**STATE v. PHIPPS**

[331 N.C. 427 (1992)]

9 June 1989, and second, that Judge Rousseau erred in concluding that his confession was free, voluntary, and made with knowledge that it could be used against him. With respect to the first question, defendant specifically argues that he was deprived of his right to counsel under the Fifth and Sixth Amendments during all questioning prior to his confession on 9 June. He argues that the law enforcement officers postponed arresting him so they could interrogate him repeatedly without affording him the constitutional protections, such as the right to counsel, that would arise during custodial interrogation or the commencement of formal adversarial proceedings.

We note first that defendant's right to counsel under the Sixth and Fourteenth Amendments "attaches only at such time as adversary judicial proceedings have been instituted 'whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *State v. Franklin*, 308 N.C. 682, 688, 304 S.E.2d 579, 583 (1983) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417 (1972)), *overruled on other grounds by State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985). In *State v. Nations*, 319 N.C. 318, 324, 354 S.E.2d 510, 514 (1987), this Court held that the defendant's Sixth Amendment right to counsel did not attach at the time of his interrogation or arrest; instead, it attached at his first appearance before a judge of the district court. In this case, defendant had not even been arrested at the time he gave his confession; thus, we cannot conclude that there was a violation of his Sixth Amendment right to counsel.

[2] With respect to defendant's claim that he was interrogated without first being advised of his constitutional rights, particularly his right to counsel under the Fifth Amendment, the crucial question is whether defendant underwent custodial interrogation. In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), the Supreme Court held:

> the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Id.* at 444, 16 L. Ed. 2d at 706 (footnote omitted). "[T]he Supreme Court of the United States has specifically rejected arguments that the principles of *Miranda* should be extended to cover interrogation in noncustodial circumstances after a police investigation has focused on the suspect . . . ." *State v. Davis*, 305 N.C. 400, 408, 290 S.E.2d 574, 580 (1982). Thus, defendant's claim of a *Miranda* violation is without merit unless there was custodial interrogation.

In resolving the question of whether there was custodial interrogation,

> the reviewing court must determine whether the suspect was in custody based upon an objective test of whether a reasonable person in the suspect's position would believe that he had been taken into custody or otherwise deprived of his freedom of action in any significant way or, to the contrary, would believe that he was free to go at will.

*Id.* at 410, 290 S.E.2d at 581; *see also United States v. Mendenhall,* 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 (1980).

We hold that Judge Rousseau correctly concluded that defendant was not in custody, and thus was not entitled to *Miranda* warnings, prior to his 2:00 a.m. confession. Defendant had cooperated with the investigation of this murder from the outset. Several times, upon request, he had come to the police station on his own. On these occasions, he had answered questions and had even been fingerprinted once. On no occasion was defendant placed under arrest; to the contrary, each time he was permitted to return home. During the investigation defendant also cooperated by returning investigators' phone calls and agreeing to meet with them to discuss his alibi for the evening of the murder. Defendant agreed to take a polygraph test and accompanied law enforcement officers to Hickory on 18 May 1989 for that purpose. Upon being advised by SBI Agent Jones that he did not have to take the polygraph test, that he had the right to remain silent, and that anything he said could be used against him, defendant chose to exercise those rights and declined to take the test. The officers acceded to defendant's choice and drove him back to North Wilkesboro. Defendant later spoke in casual circumstances with a local attorney who advised defendant that he did not have to take the polygraph test.

On the evening of 8 June 1989, law enforcement officers sought to speak again with defendant regarding the murder. Because he had no operable telephone, the officers were constrained to go to defendant's residence. Defendant agreed to go with the officers to the police station to "clear up" some matters. After about an hour at the police station, defendant agreed to go with the officers to Hickory to take the polygraph test. Defendant requested that the officers take him by his house first to inform his wife. The officers granted this request and offered to make sure defendant got something to eat on the way to Hickory. While at defendant's house, Chief Miller heard defendant's wife tell him not to take the test and to call his attorney. Defendant's response was that he wanted to clear up the matter that evening.

Instead of stopping for food on the way to Hickory, the officers complied with defendant's preference that he take the polygraph first and eat later. Once at the SBI office, defendant waited by himself in a lobby with unlocked external doors for over thirty minutes. He was allowed to use the rest room unaccompanied several times. He was again informed by Agent Jones of his rights prior to taking the polygraph test, and he signed a form indicating that he wished to waive his rights. Defendant took the polygraph test and waited alone while the results were compiled. After Agent Jones analyzed the results, he again informed defendant that he was not under arrest and was free to leave. Agent Jones then confronted defendant with the negative results and asked him to tell the truth. Defendant then asked for and received permission to call his mother. Following this phone call, defendant made and repeated his confession in which he admitted responsibility for the death of Janice Sheets.

The facts of this case are similar to those in *Davis*, where:

[T]he defendant initially came to the detective offices voluntarily and unescorted in response to a request left with his grandmother two days previously. At that time he was asked questions concerning the murder under investigation and made an exculpatory statement. This interview took place in comfortable surroundings in which the defendant was given soft drinks and in no way deprived of any physical necessities. During this first visit to the detective offices . . . the defendant was offered a polygraph examination. He agreed to take the test. Upon asking and being told what questions he would

be asked in the course of the polygraph examination, the defendant stated that he would not take the polygraph examination. The defendant thus terminated the interview, was allowed to leave at will and was given a ride home. . . . [E]very indication given the defendant was to the effect that he could terminate the questioning by leaving at any time. He in fact exercised this freedom by stating that he was not going to take the polygraph test and by leaving the police station.

The uncontroverted testimony on *voir dire* further reveals that the officers asked to see the defendant at the detective offices again at approximately 10:00 p.m. on the evening of 4 September 1980. The defendant agreed to meet with them at that time. . . . [T]he officers drove through [the defendant's] neighborhood to see if he was walking in that direction. . . . During their drive through the neighborhood, the officers saw the defendant and offered him a ride to the offices. He got into the car with them and they proceeded to the detective offices. . . . When he wanted a soft drink he was given one. When he wanted to go to the bathroom he was allowed to go. [During the second interrogation, defendant gave an inculpatory statement.]

. . . .

. . . [W]e do not think that in the context of these facts the failure specifically to advise the defendant during either the first or second periods of questioning that he was free to go at any time would have indicated to a reasonable person in the defendant's circumstances that he was not free to go at will. The defendant once exercised his right to leave, and we do not believe the conduct of the officers during the second period of questioning differed from that employed during the first period of questioning in any manner so substantial as to indicate to a reasonable person that there had been any significant change in his status which would deprive him of his freedom of action in any way. We conclude that the defendant was not in custody or deprived of his freedom of action in any significant way and that *Miranda* is not applicable.

*Davis*, 305 N.C. at 415-17, 290 S.E.2d at 584-85.

As in *Davis*, we conclude that there was no custodial interrogation within the meaning of *Miranda* prior to the time defendant

gave his confession. Further, defendant gave his confession after having been advised of his constitutional rights and after having waived those rights in writing prior to taking the polygraph examination. Thus, there was likewise no violation of *Miranda* at the time of the confession.

[3] Defendant's final argument under this assignment of error is that his waiver of rights and confession were not knowing, intelligent, or voluntary. Defendant essentially contends that the multiple interrogations, including law enforcement visits to his home, the long duration of the 8-9 June session, including the lack of sleep and food, and the confrontation with his earlier inconsistent and untruthful statements, caused both the confession and the waiver of his constitutional rights to be involuntary. For all the reasons described above relating to the question of custodial interrogation, we conclude that defendant's confession was voluntarily made, and that defendant made the confession after being advised fully of his constitutional rights and having voluntarily, knowingly, and intelligently relinquished those rights.

[4] Defendant next contends that the trial court erred in denying his pretrial motions for (1) authorization of a private investigator and (2) an *ex parte* hearing at which to apply for funds to employ expert assistance. These contentions are without merit.

In *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985), the United States Supreme Court held:

> when a[n indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.* at 83, 84 L. Ed. 2d at 66. This Court has followed *Ake* and required, upon a threshold showing that a particular matter subject to expert testimony is likely to be a significant factor in a defendant's defense, the provision of psychiatric and fingerprint experts. *State v. Moore*, 321 N.C. 327, 364 S.E.2d 648 (1988). Further, an indigent defendant has a statutory right to "counsel and the other necessary expenses of representation." N.C.G.S. § 7A-450(b) (1989); *see also* N.C.G.S. § 7A-454 (1989) (in its discretion the court may approve expert witness fee for an indigent defendant).

STATE v. PHIPPS

[331 N.C. 427 (1992)]

"[T]o establish a specific need for the assistance of an expert, the defendant must show that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that the expert assistance will materially assist him in the preparation of his case." *State v. Coffey*, 326 N.C. 268, 284, 389 S.E.2d 48, 58 (1990). Undeveloped assertions that the requested assistance would be "beneficial" or "essential" to preparing an adequate defense are insufficient to meet the threshold showing required by *Ake. State v. Tucker*, 329 N.C. 709, 719, 407 S.E.2d 805, 811 (1991) (citing *State v. Hickey*, 317 N.C. 457, 469, 346 S.E.2d 646, 654 (1986) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1, 86 L. Ed. 2d 231, 236 n.1 (1985))). We have also held that

> "[m]ere hope or suspicion" of the availability of certain evidence that might erode the State's case or buttress a defense will not suffice to satisfy the requirement that defendant demonstrate a threshold showing of specific necessity for expert assistance. *State v. Tatum*, 291 N.C. 73, 82, 229 S.E.2d 562, 568 (1976). Nor will a "general desire to search for possible evidence which might be of use in impeaching" a key witness for the State suffice as a "significant factor" in the defense so as to justify the appointment of an expert. *State v. Hickey*, 317 N.C. at 469, 346 S.E.2d at 654.

*Id.* at 719-20, 407 S.E.2d at 811-12.

Defendant sought the appointment of an investigator because his attorney did not have

> the expertise in criminal investigation work to investigate the facts and witnesses surrounding the alleged crime with which the defendant is charged. Defendant's attorney has no formal training in criminal investigation. Because of the large number of legal issues that must be researched and briefed, defendant's attorney does not physically have the time to interview all the potential witnesses that will be essential to providing the defendant with an adequate defense.

Defendant's motion for the appointment of an investigator referred to no particular evidence or issue that would be significant to the case, and simply was an insufficient showing of particularized need for expert assistance under *Ake. See State v. Locklear*, 322 N.C. 349, 355, 368 S.E.2d 377, 381 (1988). The trial court did not err in denying defendant's motion.

STATE v. PHIPPS

[331 N.C. 427 (1992)]

[5] Defendant also filed a motion for an *ex parte* hearing for additional expert assistance. The trial court denied this motion. Defendant notes that four identifiable fingerprints were located inside the victim's automobile, none of which matched the victim's or defendant's. Defendant says that at the requested *ex parte* hearing he would have sought funds to hire an expert in fingerprint identification.

Defendant contends that the trial court's ruling violated his right to due process of law, to the effective assistance of counsel, and to be reliably sentenced in a capital trial. Defendant says that specific language in *Ake* guarantees his right to an *ex parte* hearing on his motion for expert assistance: "When the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent." *Ake*, 470 U.S. at 82-83, 84 L. Ed. 2d at 66. We note that although the Court referred to an "*ex parte* threshold showing," it also stated in the paragraph denominating its express holding: "Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right." *Id.* at 83, 84 L. Ed. 2d at 66.

Defendant and the State agree that the issue of defendant's entitlement to an *ex parte* hearing is a question of first impression in this jurisdiction. Our opinions have often quoted the "*ex parte*" language from *Ake*, but the issue has never arisen squarely, as it does here. *See, e.g., State v. Tucker*, 329 N.C. at 718, 407 S.E.2d at 811; *State v. McLaughlin*, 323 N.C. 68, 83, 372 S.E.2d 49, 60 (1988), *vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 330 N.C. 66, 408 S.E.2d 732 (1991); *State v. Moore*, 321 N.C. at 344, 364 S.E.2d at 656; *State v. Smith*, 320 N.C. 404, 420, 358 S.E.2d 329, 338 (1987); *State v. Hickey*, 317 N.C. at 468, 346 S.E.2d at 654.

Our research also reveals that no federal court has passed on the question of whether an *ex parte* hearing on a motion for expert assistance is constitutionally required.[2] At the time *Ake* was decided, 18 U.S.C. § 3006A(e)(1) stated:

---

2. In *Thor v. United States*, 574 F.2d 215, 219 (5th Cir. 1978), the court said "the right to an *ex parte* hearing pursuant to [Federal Rule of Criminal Procedure]

STATE v. PHIPPS

[331 N.C. 427 (1992)]

Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an *ex parte* application. Upon finding, after appropriate inquiry in an *ex parte* proceeding, that the services are necessary and that the person is financially unable to obtain them, the court . . . shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1) (1988); *see also* Fed. R. Crim. P. 17(b).[3] The then-existing federal practice may shed light on the origin of the *"ex parte"* language in the *Ake* opinion. The federal practice under the statute has persisted, and several federal courts have enforced the statutory right of an indigent defendant to an *ex parte* hearing when seeking expert assistance. *See United States v. Dolack*, 484 F.2d 528 (10th Cir. 1973); *United States v. Sutton*, 464 F.2d 552 (5th Cir. 1972); *United States v. Theriault*, 440 F.2d 713 (5th Cir. 1971); *Marshall v. United States*, 423 F.2d 1315 (10th Cir. 1970).

Three states have addressed the question of whether *Ake* demands, rather than presumes, that the request for expert assistance be heard *ex parte*. In *Brooks v. State*, 259 Ga. 562, 385 S.E.2d 81 (1989), the Supreme Court of Georgia stated:

We have found no clear authority, and the parties have shown us none, mandating that hearings on motions for public funds be held *ex parte*. The *Ake* holding does not clearly mandate that the hearing be *ex parte*. Other federal cases upon which defendant relies construe federal statutes providing for *ex parte* hearings and are not binding upon us.

. . . .

Identification of the right which is at stake here is more complicated than acknowledging the right of the indigent defendant to obtain the expert assistance necessary to assist in preparing his defense. While exercising that right, the de-

---

17(b) does not appear to rise to a constitutional level." The federal rule considered in *Thor* provides for issuance of subpoenas and the payment of witness fees for indigent defendants. We note, however, that *Thor* was decided prior to *Ake*.

3. Several states have codified procedures for providing expert assistance to indigent defendants following an *ex parte* showing of need. *See* Kan. Stat. Ann. § 22-4508 (1988); S.C. Code Ann. § 16-3-26(C) (Law. Co-op. Supp. 1991); Tenn. Code Ann. § 40-14-207(3)(b) (1990).

STATE v. PHIPPS

[331 N.C. 427 (1992)]

fendant also has the right to obtain that assistance without losing the opportunity to prepare the defense in secret. Otherwise, the defendant's "fair opportunity to present his defense," acknowledged in *Ake*, will be impaired.

*Id.* at 564-65, 385 S.E.2d at 83-84. The court went on to prescribe a procedure by which an indigent defendant would seek funds for expert assistance:

The matter will be heard *ex parte.* The state may submit a brief, which will be considered at the time of the *ex parte* hearing. The *ex parte* proceeding shall be reported and transcribed as part of the record but shall be sealed in the same manner as are those items examined *in camera.* The court in its discretion may reserve issues to be heard at a separate hearing at which the state will be present. The state may always be represented when the defendant is examined as to his indigency.

*Id.* at 566, 385 S.E.2d at 84. In *McGregor v. State*, 733 P.2d 416 (Okla. Crim. App. 1987), the court granted a writ of mandamus requiring a previously ordered evidentiary hearing to be held *ex parte.* The hearing was on the defendant's motion for a court-appointed psychiatrist. The court summarily concluded that "[t]he intention of the majority of the *Ake* Court that such hearings be held *ex parte* is manifest." *Id.* at 416. The court based its conclusion on the same passage in *Ake* as does this defendant. To the contrary, the Supreme Court of South Dakota has held that a state statute requiring that "appointment of expert witnesses by the court shall be made only after reasonable notice to the parties to the proceeding of the names and addresses of the experts proposed for appointment" does not violate a defendant's rights to due process or equal protection of the law. *State v. Floody*, 481 N.W.2d 242, 254-56 (S.D. 1992).

We conclude that the decision to grant an *ex parte* hearing is within the trial court's discretion. Though such a hearing may in fact be the better practice, it is not always constitutionally required under *Ake.* In *Ake* the right to expert psychiatric assistance on behalf of indigent defendants was rooted in the Due Process Clause of the Fourteenth Amendment:

This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal

proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. . . .

. . . We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. . . . To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," . . . and we have required that such tools be provided to those defendants who cannot afford to pay for them.

*Ake*, 470 U.S. at 76-77, 84 L. Ed. 2d at 61-62 (citation omitted).

Whereas an indigent defendant's access to the "basic tools of an adequate defense" is a core requirement of a fundamentally fair trial, the need for an *ex parte* hearing on a motion for expert assistance is not. Defendant may participate meaningfully in the preparation of his defense even though the prosecutor is present for and contests his motion for expert assistance.

The primary justification for an *ex parte* hearing is that it allows an indigent defendant to make a detailed showing, sufficient to meet the *Ake* threshold, of his need for expert assistance without alerting the prosecution to vital trial strategy and theories of defense. Though this is a desirable advantage, and one available to both the State and nonindigent defendants, we conclude that its absence does not necessarily render the trial of an indigent defendant fundamentally unfair.

Apart from its holding that the states would be responsible for implementing the right recognized in *Ake*, that decision included several other references suggesting that an *ex parte* hearing is not necessarily constitutionally required. First, in conducting its due process balancing test, the Court implicitly recognized that the State's interest in its economy is a valid consideration. The

**STATE v. PHIPPS**

[331 N.C. 427 (1992)]

Court stated that "it is difficult to identify any interest of the State, other than that in its own economy, that weighs against recognition of this right," *Ake*, 470 U.S. at 79, 84 L. Ed. 2d at 63, and noted that "[m]any States, as well as the Federal Government, currently make psychiatric assistance available to indigent defendants, and they have not found the financial burden so great as to prejudice this assistance," *id*. at 78, 84 L. Ed. 2d at 63. Through such language the Court recognized the need to balance the importance of the protection sought with the associated cost to the State. Because the "assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense," *id*. at 80, 84 L. Ed. 2d at 64, the Court concluded that cost considerations failed to tip the balance in favor of the State. Although the Court tipped the scales in favor of the accused when considering the importance of obtaining expert assistance to aid in building a defense, it did not address the importance of the procedures by which expert assistance is sought.

Further, the Court realized that although indigent defendants must be afforded the basic tools for an effective defense, it would not be possible to require that indigent defendants have all the advantages and privileges that result from greater wealth. The Court held that a psychiatrist must be appointed upon a threshold showing that a defendant's sanity would be a significant issue at trial, but it was careful to note: "This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Id*. at 83, 84 L. Ed. 2d at 66.

For the reasons described above, we conclude that *Ake* did not mandate that motions for expert assistance be heard *ex parte*. We also conclude that an *ex parte* hearing is not constitutionally required in every case. There are strong reasons for conducting the hearing *ex parte*, and the court may, in its discretion, do so. Defendant has failed to demonstrate any prejudice from the denial of his motion here. We thus find no abuse of discretion and overrule this assignment of error.

[6] Defendant next contends that the trial court abused its discretion in allowing the State to put into evidence certain testimony and numerous exhibits. He says first that an excessive number of graphic and repetitious photographs of the crime scene and victim were erroneously admitted over his objection. Second, de-

fendant contends that an excessive volume of physical evidence and expert or investigative testimony was presented, despite its failure to link the defendant to the crime, so as to confuse and unduly prejudice the defendant. Defendant objected to the evidence based on Rule 403 of the Rules of Evidence:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1988).

In *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988), we described the proper framework for analyzing a defendant's contention that the trial court admitted unduly prejudicial and inflammatory photographs.

> "Unfair prejudice" means an undue tendency to suggest a decision on an improper basis, usually an emotional one. *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430 (1986). Photographs are usually competent to explain or illustrate anything that is competent for a witness to describe in words, . . . and properly authenticated photographs of a homicide victim may be introduced into evidence under the trial court's instructions that their use is to be limited to illustrating the witness's testimony. . . . Thus, photographs of the victim's body may be used to illustrate testimony as to the cause of death. Photographs may also be introduced in a murder trial to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree, . . . and for this reason such evidence is not precluded by a defendant's stipulation as to the cause of death. . . . Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury. . . .
>
> This Court has recognized, however, that when the use of photographs that have inflammatory potential is excessive or repetitious, the probative value of such evidence is eclipsed by its tendency to prejudice the jury.
>
> . . . .

In general, the exclusion of evidence under the balancing test of Rule 403 . . . is within the trial court's sound discretion. . . . Whether the use of photographic evidence is more probative than prejudicial and what constitutes an excessive number of photographs in the light of the illustrative value of each likewise lies within the discretion of the trial court. . . . Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. . . .

The test for excess is not formulaic: there is no bright line indicating at what point the number of crime scene or autopsy photographs becomes too great. The trial court's task is rather to examine both the content and the manner in which photographic evidence is used and to scrutinize the totality of circumstances composing that presentation. What a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, the scope and clarity of the testimony it accompanies — these are all factors the trial court must examine in determining the illustrative value of photographic evidence and in weighing its use by the state against its tendency to prejudice the jury.

*Id.* at 283-85, 372 S.E.2d at 526-27.

In *Hennis*, the Court found reversible error where the State introduced thirty-five eight-by-ten-inch glossy photographs and duplicate slides. The circumstances under which the photographs and slides were introduced, however, were important to the determination that error occurred. The State constructed a screen upon which the slides were projected in images three feet ten inches by five feet six inches, and in such a manner that the images were projected immediately above the defendant's head. Nine of the slides illustrated the testimony of the deputy sheriff who discovered the bodies of the three victims, and twenty-six slides illustrated the testimony of the pathologists who conducted the autopsies. The photographs, most of which were in color, were distributed to the jury in silence, one at a time, for a full hour.

In the present case, the State introduced fifty-two color photographs of the crime scene and the victim's body. Of these, thirty-eight illustrated testimony regarding the scene of the crime and, though some revealed the presence of blood, none showed

STATE v. PHIPPS

[331 N.C. 427 (1992)]

more of the victim's body than her foot protruding from an open car door. Of the fourteen remaining photos, six related to the testimony concerning the autopsy report. These six photos depicted isolated areas of injury to the scalp and the neck, and the injuries as they appeared to the upper torso as a whole. Three photographs showed the victim's body slumped over in the car, but none of her injuries were apparent. Three photos of the victim's body in the car, and one photo taken at the morgue, were particularly gruesome, but without undue repetition they illustrated Agent Melton's testimony regarding his investigation of the crime. The remaining photograph depicted what was described as a defensive, sharp force injury to the victim's finger.

The circumstances surrounding the presentation of these photographs, and the photographs themselves, are not such that we can say their admission into evidence for illustrative purposes was not the result of a reasoned decision. The number of photographs alone is an insufficient measure of their capacity to prejudice and inflame the jury; instead, the court looks to their probative value and the circumstances of their introduction into evidence. *See State v. Robinson*, 327 N.C. 346, 358, 395 S.E.2d 402, 409 (1990). The trial court carefully considered the photographs prior to admitting them into evidence, and we cannot conclude that it abused its discretion in admitting them. This assignment of error is overruled.

[7] Further, we reject defendant's argument that the cumulative effect of the prodigious volume of physical evidence and expert or investigative testimony was confusion and undue prejudice. Defendant argues that the State, in an improper attempt to prejudice the jury, presented physical evidence such as bloodstained objects from the victim's car (for example, the victim's purse, soft drink can, telephone book, and key chain, in addition to car door panels, windows, and steering wheel), scientific evidence (such as fingerprint, serology, and hair identification tests which failed to link defendant to the crime scene), and investigative testimony relating to the above. According to defendant, prejudice occurred because the State was sending a subtle message to the jury that it had conducted an exhaustive investigation of the murder and had isolated only one possible perpetrator — defendant. Given that message, defendant fears the jury was inclined to convict him regardless of the fact that despite the comprehensive investigation there was little direct evidence linking him to the crime.

STATE v. PHIPPS

[331 N.C. 427 (1992)]

In remarking on the propriety of a prosecutor's closing argument, we have said:

> The solicitor, an officer of the State, after investigation, determined, on behalf of the State, that the defendant should be tried for this offense and that the death penalty should be sought. These determinations having been made on behalf of the State, it was the right and duty of the prosecuting attorney, vigorously, but fairly and in accordance with the law, *both in the presentation of evidence* and in his argument, to seek that result.

*State v. Westbrook*, 279 N.C. 18, 37, 181 S.E.2d 572, 583 (1971) (emphasis added), *judgment vacated on other grounds*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972). Under the circumstances of this case, we find no error in the manner in which the prosecutor sought to fulfill his duty through the presentation of evidence. Further, defendant's suggestion that the jury was convinced to convict him for any improper purpose is belied by the import of defendant's own admission of his responsibility for the death of Janice Sheets.

[8] Defendant next contends that the trial court committed reversible error when it refused his request for a jury instruction on voluntary intoxication as a defense to premeditated and deliberated murder. Defendant says the failure to instruct on the legal significance of his voluntary intoxication evidence unconstitutionally lightened the State's burden of proving premeditation and deliberation.

The controlling precedent on this question is *State v. Mash*, 323 N.C. 339, 372 S.E.2d 532 (1988). In *Mash*, the Court stated:

> A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.
>
> The evidence must show that at the time of the killing the defendant's mind and reason were so completely intox-

icated and overthrown as to render him utterly incapable
of forming a deliberate and premeditated purpose to kill.
. . . In absence of some evidence of intoxication to such
degree, the court is not required to charge the jury thereon.

*Id.* at 346, 372 S.E.2d at 536 (quoting *State v. Strickland,* 321
N.C. 31, 41, 361 S.E.2d 882, 888 (1987) (quoting *State v. Medley,*
295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978) ) ) (citations omitted).

"When determining whether the evidence is sufficient to en-
title a defendant to jury instructions on a defense or mitigating
factor, courts must consider the evidence in the light most favorable
to defendant." *Id.* at 348, 372 S.E.2d at 537. Defendant presented
no evidence relating to his degree of intoxication. Instead, defend-
ant relies on evidence presented by the State. This evidence is
twofold. First, Agents Jones and Foster testified regarding defend-
ant's inculpatory statement in which he said he got off work at
either 10:00 or 10:30 p.m. and then went to the Run-In to buy
a six-pack of beer. Defendant rode around for a while, drinking
beer and smoking marijuana, until shortly before 11:00 p.m. Accord-
ing to his statement to the agents, defendant was "pretty buzzed
on beer and pot." Second, Mark McNeill, who worked at the Run-In
on the night of the murder, corroborated defendant's statement
that he purchased beer that evening. Defendant makes no reference
to additional evidence in the record relating to his state of intoxica-
tion at any relevant time.

We hold that the trial court was correct to deny defendant's
requested instruction on voluntary intoxication, as the evidence
was insufficient to warrant such an instruction. The evidence falls
far short of that found to be sufficient in *Mash,* where the defendant
had been seen drinking from 4:00 p.m. until 11:00 p.m., where
witnesses described him as "definitely drunk" and "pretty high"
by 9:30 p.m., and where the defendant's actions became "drunker,
wilder and out of control." *Mash,* 323 N.C. at 348, 372 S.E.2d at
538; *see also State v. Baldwin,* 330 N.C. 446, 463, 412 S.E.2d 31,
41 (1992) (insufficient evidence of intoxication where defendant drank
five or six beers and consumed an indeterminate amount of mari-
juana and cocaine).

[9] Defendant also argues that the high evidentiary standard of
proof required as a prerequisite to a voluntary intoxication instruc-
tion unconstitutionally prevents a defendant from presenting
evidence in his defense. We see no merit to this contention, as

the presence of a burden of production on an issue cannot reasonably be said to preclude introduction of evidence thereon. Accordingly, we overrule this assignment of error.

[10]  Defendant next contends that the trial court erred in denying his request to submit to the jury the possible verdict of second-degree murder. Such an instruction is required under the following circumstances:

> Under North Carolina and federal law a lesser included offense instruction is required if the evidence "would permit a jury rationally to find [defendant] guilty of the lesser offense and acquit him of the greater." *Strickland*, 307 N.C. at 286, 298 S.E.2d at 654, quoting *Beck v. Alabama*, 447 U.S. 625, 635, 65 L. Ed. 2d 392, 401 (1980). The test is whether there "is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense." *State v. Wright*, 304 N.C. 349, 351, 283 S.E.2d 502, 503 (1981). . . .
>
>> It is well settled that "a defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternative verdicts." *State v. Palmer*, 293 N.C. 633, 643-44, 239 S.E.2d 406, 413 (1977). On the other hand, the trial court need not submit lesser included degrees of a crime to the jury "when the State's evidence is positive as to each and every element of the crime charged *and there is no conflicting evidence relating to any element of the charged crime.*"
>
> *State v. Drumgold*, 297 N.C. 267, 271, 254 S.E.2d 531, 533 (1979), quoting *State v. Harvey*, 281 N.C. 1, 13-14, 187 S.E.2d 706, 714 (1972) (emphasis in original). Such conflicts may arise from evidence introduced by the State . . . or the defendant. They may arise when only the State has introduced evidence.

*State v. Thomas*, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989) (citations omitted).

Defendant does not contend there was insufficient evidence of premeditation and deliberation, making submission of the first-degree murder charge error. Instead, he contends, and we agree, that the State's evidence would have permitted a rational jury to convict him of second-degree murder. Second-degree murder

is defined as the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Young*, 324 N.C. 489, 493, 380 S.E.2d 94, 96 (1989).

In its case-in-chief, the State presented testimony of Agents Jones and Foster regarding defendant's inculpatory statements. According to their testimony, defendant stated that he got off work between 10:00 and 10:30 p.m. the night of the murder. At the victim's request, defendant used her keys to open her car door and put a box on the front seat. He then returned the keys and told the victim he was going to make a phone call. The victim, who had known defendant since they had worked together at Kentucky Fried Chicken several years previously, and who had hired defendant to work at Adams Seafood, then said, "Well, if you're going to be around a while, why don't you ride to the bank with me?" Defendant agreed to do so, and he telephoned his mother from the pay phone inside the restaurant. While waiting to go to the bank, defendant went to buy beer at the Run-In and then came back to the restaurant and waited for about thirty minutes. The victim came outside eventually and asked defendant if he was ready to go. When defendant replied "Yes," she asked if he wanted to follow her in his car or to ride with her. Defendant said that he would ride with her.

Defendant got in the front seat next to the victim and they rode together towards the bank. On the way, defendant asked how much money was made that night. He then said that he needed the money because he was about to lose his home. He asked if she could give the money to him. The victim replied, "Hell, no!" When they arrived at the bank, defendant said again, "Janice, I need that money." The victim made a response that defendant could not remember, then he tried to snatch the money bag. The victim, who was five feet nine inches tall and weighed 230 pounds, "smacked the hell out of [defendant]." She then tried to get out of the car and defendant grabbed her by the hair and pulled her back into the car.

According to the testimony relating his confession, defendant then said the victim grabbed a chrome bar that looked like a ratchet and tried to hit him with it. Defendant stopped the blow, took the bar, and hit her with it several times. He tried again to get the money bag, but the victim produced a large pocketknife and tried to cut him. Defendant wrestled the knife from her and stabbed

STATE v. PHIPPS

[331 N.C. 427 (1992)]

her in the neck. Defendant then grabbed the money bags, the knife, and the bar, and left.

" 'Whenever there is any evidence or when any inference can be fairly deduced therefrom tending to show a lower grade of murder, it is the duty of the trial judge, under appropriate instructions, to submit that view to the jury.' " *State v. Strickland*, 307 N.C. at 285, 298 S.E.2d at 653 (quoting *State v. Perry*, 209 N.C. 604, 606, 184 S.E. 545, 546 (1936) ). From the evidence described above, a rational jury could have concluded that defendant killed Janice Sheets with malice but without premeditation and deliberation. The jury could have concluded that defendant carried no weapons with him when he went to the bank with the victim, and that he merely tried to take the money bags from her with permission or with the force of his own hands. If the jury believed his statement, it could have concluded that defendant only killed the victim as a result of the struggle that ensued after defendant pulled the victim back into the car and after the victim escalated the struggle by using deadly weapons to defend herself. Thus, the jury could have concluded that defendant killed the victim with malice but without the premeditation and deliberation necessary for first-degree murder. It therefore was error for the trial court to refuse to instruct on second-degree murder.

Defendant is not entitled to a new trial, however, because the jury based its verdict on both premeditation and deliberation and the felony murder rule. Defendant's first-degree murder conviction under the felony murder rule is without error and is therefore upheld. *See State v. Wall*, 304 N.C. 609, 286 S.E.2d 68 (1982). As a result, however, we must arrest judgment on the conviction for the underlying felony, robbery with a dangerous weapon.

First-degree murder (89 CRS 3312)—no error.

Robbery with a dangerous weapon (89 CRS 3311)—judgment arrested.

Justice MEYER dissenting.

I do not agree with the majority's conclusion that defendant's "first-degree murder conviction may be upheld only by virtue of the felony murder rule" and that the Court must therefore "arrest judgment on the underlying felony, robbery with a dangerous

weapon." I believe that the trial court properly refused to submit second-degree murder as a lesser offense of the charge of first-degree murder committed with premeditation and deliberation and that it committed no error requiring the reversal of defendant's convictions or the sentences imposed thereon.

It is not every case in which first-degree premeditated and deliberated murder is charged that an instruction on second-degree murder must be given. *State v. Strickland*, 307 N.C. 274, 284-85, 298 S.E.2d 645, 653 (1983). Such an instruction must be given as a lesser offense of first-degree premeditated and deliberated murder only where the evidence presented at trial raises a genuine issue as to whether the defendant acted with premeditation and deliberation in the killing. In making this determination, the question is not whether the jury could convict defendant of second-degree murder but whether "the evidence, reasonably construed, tend[s] to show lack of premeditation and deliberation." *Id.* at 287, 298 S.E.2d at 654.

Relying on a portion of defendant's confession, wherein defendant stated that the victim "smacked the hell out of [defendant]," tried to hit defendant with a chrome bar resembling a ratchet, and pulled a pocketknife on defendant, the majority states:

> [A] rational jury could have concluded that defendant killed [the victim] with malice but without premeditation and deliberation. . . . If the jury believed his statement, it could have concluded that defendant only killed the victim as a result of the struggle that ensued after defendant pulled the victim back into the car and after the victim escalated the struggle by using deadly weapons to defend herself.

I disagree.

The evidence presented at defendant's trial showed a ruthless killing committed by a man who had devised a plan to rob his employer and who had committed himself to using whatever force was necessary to carry out his plan. The evidence, viewed in a light most favorable to defendant, showed that the victim had refused to hand over the money to defendant and had "started out of the car" when defendant "grabbed her by the hair and pulled her into the car." When the victim sought to defend herself, first with a ratchet and then with a pocketknife, defendant overcame the victim and responded by inflicting multiple blows to the victim's

**STATE v. PHIPPS**

[331 N.C. 427 (1992)]

head. The uncontradicted evidence presented at trial showed that defendant inflicted eighteen blows to the victim's head, all while she was alive. Many of the blows were inflicted with such force as to expose the victim's skull. Not content with the fact that the victim was only stunned by the blows, defendant then proceeded to slash the victim's throat, inflicting the four inch long, one and one-half inch wide fatal wound that completely severed the victim's right jugular vein, partially severed the victim's right common carotid artery, and cut the victim's thyroid cartilage deeply enough to expose the victim's windpipe. Having accomplished this, defendant then grabbed the deposit bags containing his employer's money and fled the scene.

In my opinion, the statement by defendant raises no question as to the premeditation and deliberation on the part of defendant. Even assuming that defendant had not formed an intent to kill the victim before he dealt the first blow to her head, I fail to see how any rational juror could have reasonably found that defendant, having dealt eighteen blows to the victim's head, did not act with premeditation and deliberation when he subsequently slashed the victim's throat and left her helpless, to bleed to death.

Based on the overwhelming evidence of defendant's guilt, the jury returned the only reasonable verdict, finding defendant guilty of first-degree murder based upon the theories of premeditation and deliberation and of felony murder. I find it beyond all reason and logic to conclude, as does the majority, that the jury may have found that defendant did not act with premeditation and deliberation had it been instructed on second-degree murder. I therefore dissent from the portion of the majority opinion that concludes that the trial court erred in failing to submit the charge of second-degree murder.

Associate Justices MITCHELL and LAKE join in this dissenting opinion.